# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ANGEL L. JOHNSON,

     *Plaintiff*,

*v.*                       CASE NO. 2:13-cv-14797

CAROLYN W. COLVIN         DISTRICT JUDGE BERNARD A. FRIEDMAN
Commissioner of Social Security,   MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for Supplemental Security Income ("SSI")

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

under Title XVI, 42 U.S.C. § 1381 *et seq.*, and for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 18.)

Plaintiff Angel Johnson was thirty-eight years old when she applied for benefits on March 30, 2011. (Transcript, Doc. 11 at 183, 190.) She alleges her disability began on August 19, 2009. (*Id.*) Plaintiff's work history includes jobs as a cashier, cook, waitress, bartender, stock clerk, and machine operator. (Tr. at 23, 203, 246.) At the initial administrative stage, the Commissioner considered back disorders and denied her claims.[2] (Tr. at 92-93.) Plaintiff asked for a hearing in front of an Administrative Law Judge ("ALJ"), who would consider the application de novo. (Tr. at 135-44.)

---

[2] The record also contains initial denial sheets from 2008 and 2009, and other forms from that period. (Tr. at 54-59, 323-30.) Plaintiff had four prior filings: one from 2007 and 2008 each, and two in 2009. (Tr. at 71.) All were rejected at the initial stage. (*Id.*) The Sixth Circuit has strongly suggested *res judicata* applies to initial determinations. *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) (citing *Draper v. Sullivan*, 899 F.2d 1127, 1130 (11th Cir. 1990)) (stating the doctrine applies to these decisions); *Sayegh v. Sec'y of Health & Human Servs.*, 931 F.2d 56, 1991 WL 60965, at *1 (6th Cir. 1991) (noting "that the Secretary's [i.e., the Commissioner's] initial determinations of claimant's eligibility for benefits are to be given preclusive effect in the consideration of subsequent applications for benefits with the identical facts and issues'" (quoting *Carver v. Sec'y of Health & Human Servs.*, 869 F.2d 289, 291 (6th Cir. 1989)); *Wilson v. Califano*, 580 F.2d 208, 211 (6th Cir. 1978) (noting that *res judicata* can apply even where "no oral hearing was held before an ALJ on the prior application"); *Miller v. Astrue*, No. 3:11-cv-133, 2012 WL 220234, at *1-3 (S.D. Ohio Jan. 25, 2012) (applying *res judicata* to initial determination regarding SSI), *adopted by* 2012 WL 4504545, at *2 (S.D. Ohio Sept. 28, 2012); 20 C.F.R. §§ 404.957, 416.1457 (allowing ALJ to dismiss a hearing request based on the *res judicata* effect of either a prior determination or decision).

Nonetheless, the Circuit has also expressed scepticism that these determinations merit *res judicata*. *See Asbury v. Comm'r of Soc. Sec.*, 83 F. App'x 682, 684 n.1 (6th Cir. 2003) ("We recognize that the applicability of the *Drummond* analysis is not clear with respect to administrative decisions that do not follow 'trial-type' hearings."); *Rogers v. Comm'r of Soc. Sec.*, 225 F.3d 659, 2000 WL 799332, at *5 (6th Cir. 2000) (unpublished table decision) ("[T]he denial of Rogers's 1981 application was an initial determination that did not come after a 'trial-type hearing' . . . , so it is not altogether clear that the doctrine of res judicata even applies to the 1981 initial determination."). Considering the tensions in the case law and the parties' failure to raise the argument, the Court will not address the doctrine. Moreover, because the Court recommends rejecting Plaintiff's argument, the same result would likely obtain under a *res judicata* analysis.

ALJ Thomas L. English convened the hearing on May 16, 2012. (Tr. at 30-51.) In his decision dated July 18, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 13-24.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on October 24, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On November 20, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.     Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005)

(quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

6

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the application date and met the insured status requirements through December 31, 2012. (Tr. at 15.) At step two, the ALJ concluded that new evidence showed Plaintiff had the following severe impairments: "degenerative disc disease, lumbar spine, status-post surgery; and chronic obstructive

7

pulmonary disease/asthma." (Tr. at 15-19.) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 20.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in the regulations, 20 C.F.R. §§ 404.1567(b), 416.967(b), with additional limitations. (Tr. at 21-23.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 23.) At step five, the ALJ found that a significant number of jobs existed suitable to Plaintiff's limitations. (Tr. 23-24.)

### E.   Administrative Record

### 1.   Medical Records

Plaintiff complained of lower back pain and left leg paresthesias in early 2006. (Tr. at 350.) She later dated the pain's onset as 1997. (Tr. at 525.) X-rays of her lumbar spine taken February 2007 showed normal alignment, L5-S1 disc herniation, mild L3-L4 stenosis, and mild spinal narrowing at L4-L5; but no nerve root compression or spondylolysis was seen. (*Id.*) Imaging tests from May 2007 found minimal "wedge compression" of T12 and L1 and minimal degenerative spurring at L4. (Tr. at 349.) There was no evidence of "intervertebral disc space narrowing" or spondylolysis. (*Id.*) An MRI later that month displayed "a degenerative disc at the L5-S1 level with what appear[ed] to be disc material compromising the existing L5 nerve root as well as abutting the transversing S1 nerve root." (Tr. at 351, 425.)

In August 2007, Dr. Miguel Lis-Planells performed surgery on Plaintiff's back. (Tr. at 352, 517-20.) Her intake form listed a host of attempted treatments, from injections to surgery. (Tr. at 525.) Medications gave some relief, she said. (Tr. at 525-26.) She needed "[a] little" rest during the day because of the pain, it caused weakness but not numbness, and it was aggravated by sitting,

standing, bending, and lying down, but not walking. (Tr. at 526.) She did not exercise, and her emotional health was "ok," she wrote. (Tr. at 530.)The pre- and post-operation diagnoses were lumbar disk herniation, degeneration, and radiculopathy. (Tr. at 325.) The surgery consisted of various procedures, all at the L5-S1 disc level: "right transforaminal diskectomy and decompression" of nerve roots; posterior antibody fusion; application of prosthetic device; posterior lateral fusion; and implementation of pedicle screws. (Tr. at 352-53.) In his operation notes, Dr. Lis-Planells explained that conservative treatments had failed to relieve Plaintiff's "intractable" back pain, which radiated down to her right foot. (Tr. at 353, 356.) "She did very well postoperatively[,] without incident or complication," wearing a lumbar brace when out of bed. (Tr. at 357.) She was discharged two days later with instructions to continue wearing the brace, stop smoking cigarettes, and avoid lifting, pulling, bending, twisting, or sitting for over one to two hours. (*Id.*)

Plaintiff returned to Dr. Lis-Planells on September 12, 2007, for a follow-up examination. (Tr. at 502.) She reported her overall status was "okay." (*Id.*) Her arms and legs had normal strength, her sensation remained intact, and sensory testing was normal. (Tr. at 502-03.) Her Romberg test was negative. (Tr. at 503.) With a cane, her gait was normal, and she performed heel, toe and tandem walking without difficulties. (*Id.*) X-rays showed the devices implemented during the surgery were "in good anatomical position." (Tr. at 503, 515.) Dr. Lis-Planells concluded she was "recovering well . . . ." (Tr. at 503) Her next examination, in October, was similar. (Tr. at 498.) Her pain was decreasing, her strength was normal, and x-rays revealed that the surgical implementations were adequately placed. (Tr. at 498-99, 514.)

The pain was "slowly getting better," Plaintiff stated when she checked in with Dr. Lis-Planells in November. (Tr. at 494.) During the examination, her cervical spine's range of motion showed improvement, but overall spinal motion remained limited. (*Id.*) Straight-leg raising tests, measuring sciatic nerve pain, were negative. (*Id.*) *See* Cathy Speed, *ABC of Rheumatology: Low Back Pain*, 328 Brit. Med. J. 1119, 1120 (2004). The rest of the examination results had not changed. (Tr. at 495.) X-rays showed that the fusion was "in progress" at L5-S1; however, a magnetic resonance imaging ("MRI") test revealed "a focal herniated disc at C7-T1 with no significant cord compression" or stenosis. (Tr. at 416, 495, 512-13.) The results also showed mild degenerative changes in her cervical spine. (Tr. at 416, 513.) Dr. Lis-Planells thought Plaintiff was recovering "well," and planned to slowly reduce her use of the brace and discontinue physical therapy. (Tr. at 496.) He did not believe that surgery was yet necessary to repair the C7-T1 herniation "since there is no clinical evidence of cervical radiculopathy or myelopathy." (*Id.*)

Plaintiff began consulting with Dr. Michael Sheth in February 2008. (Tr. at 319-22, 370-72.) Their first appointment included a thorough examination to see whether Plaintiff needed epidural injections. (*Id.*) According to Plaintiff, the 2007 surgery eased, but did not eliminate, the pain in her right leg, especially around the knee; and her back pain now seemed worse. (Tr. at 319.) The pain generally registered at level five out of ten on an ascending scale; during the appointment it was at level seven. (*Id.*) Sleep was difficult, as the pain limited her to only six to nine hours of sleep per night. (*Id.*) Nearly any physical activity, including sitting, standing, and lying down, exacerbated the pain, while medications, such as Vicodin and Flexeril, provided only "a little relief" and physical therapy too proved ineffective. (Tr. at 319-20.) She had not worked since her surgery. (Tr. at 321.)

10

Dr. Sheth examined Plaintiff's musculoskeletal condition in depth. (Tr. at 321.) Her strength was consistently normal "in all muscle groups"; her gait was normal, she could "briefly" walk on her heels and toes; her cervical spine had a "good range of motion" and was not tender; her thoracic spine was not tender; her "mid to lower dorsal" and lumbar spine was tender; and her lumbar range of motion was decreased. (*Id.*) Bending forward and backward produced pain. (*Id.*) Seated straight-leg raises were negative, but supine straight-leg raises to forty-five degrees also were painful, (*id.*), which is generally considered a "positive" rather than "negative" result. *See* Speed, *supra*, at 1120. He diagnosed chronic low and thoracic back pain, along with chronic right thigh pain and asthma. (Tr. at 321.) They planned to employ a host of treatment procedures. (*Id.*)

By February 2008 Plaintiff reported to Dr. Lis-Planells that the pain had not "significantly improved, although there [was] no lower extremity radicular pain." (Tr. at 491.) Her mid-back and neck began to hurt as well, and physical therapy after the surgery was unsuccessful. (*Id.*) Her lumbar spine was tender, but not spasming, and the doctor noted there were no "trigger points" and the straight-leg raising test remained negative. (*Id.*) Her strength and gait were normal and she walked on her toes, heels, and in tandem without difficulty. (Tr. at 492.) X-rays showed "solid fusion at L5-S1,"(*id.*), and only "mild disc[-]space narrowing," anterolisthesis, and levoscoliosis. (Tr. at 318.) Dr. Lis-Planells wanted to review new MRIs before charting a treatment course, and told Plaintiff to return when the MRIs were ready. (Tr. at 492.) In April, he wrote a brief note stating the MRI showed "no evidence of recurrent disc herniation . . . ." (Tr. at 390, 399, 489, 511.) He believed she might continue to improve without surgery, and he referred her back to physical therapy. (Tr. at 489.) Unmentioned in the note, but written in the radiologist's report, was the possibility that scar tissue had formed "just below" a nerve root after the surgery. (Tr. at 399, 511.)

On March 10, Plaintiff told Dr. Sheth that she felt "relatively well," rating her pain at seven out of ten on an ascending scale. (Tr. at 479.) "She is functioning relatively well and does not have many issues" aside from her back pain, Dr. Sheth reported. (*Id.*) Injections seemed to only aggravate the pain. (*Id.*) Dr. Sheth reproduced the pain by touching her back, and hyperextension of her back also produced pain. (*Id.*) The diagnoses were post-laminectomy syndrome, lumbar radiculopathy, right lumbar facet arthropathy, and right sacroiliac joint dysfunction. (Tr. at 479, 483, 486.) Dr. Sheth set out a series of procedures for treatment, (Tr. at 479); he performed them the next month, including, among others, injection, drainage, and lysis of epidural adhesions.[3] (Tr. at 483-88.)

Later in April, Dr. Sheth added thoracic spine pain to the diagnoses, though a thoracic MRI was "essentially negative," and planned to continue the injections. (Tr. at 296, 298, 313, 361, 363, 474, 481.) The MRI did find mild degeneration in her upper lumbosacral spine. (Tr. at 313.) However, there was no evidence of "recurrent disc herniation" or that the hardware implanted during the surgery had malfunctioned. (Tr. at 489.)They tried the same procedures again in May. (Tr. at 293-95, 358-59, 476-78, 293-95.) Dr. Sheth administered more injections later that month after Plaintiff explained her condition varied between "good" and "bad" days, with her pain level generally at five out of ten on an ascending scale. (Tr. at 472.)

---

[3] Epidural adhesions are fibrous tissue, like scar tissue, that commonly develop in the epidural space after invasive procedures, such as spinal surgery, and "render[] the nerve susceptible to injury via compression phenomena, ie, stenosis, disc, etc." Susan R. Anderson, et al., *Evolution of Epidural Lysis of Adhesions*, 3 Pain Physician 262, 264 (2000); *see also* Anthem Blue Cross & Blue Shield, *Lysis of Epidural Adhesions, Medical Policy Statement* # SURG.00072 (July 15, 2012), *available at* http://www.anthem.com/medicalpolicies/policies/mp_pw_a050271.htm. The lysis procedure is used "when conservative management for spinal or radicular pain has failed." Anderson, *supra*, at 262.

In April, Plaintiff told Dr. Lis-Planells that her back continued to hurt, though her leg pain had improved. (Tr. at 373, 545.) Straight-leg raise tests were negative, and no spasming occurred in the lumbar spine. (*Id.*) Her strength was normal and she walked without difficulty. (Tr. at 374, 546.) He determined that Plaintiff had not "reached maximum medical improvement," so further surgery was unnecessary. (Tr. at 375.)

Plaintiff also saw a physician's assistant at her primary physician's office in May. (Tr. at 310-11, 346-47.) Asthma ran in her family, and she used albuterol four to five times per day. (Tr. at 310, 347.) A spirometry test from October 2007 had been normal. (Tr. at 17, 291.) However, she recently began wheezing, developed a chronic cough, and lost her breath during exercise. (*Id.*) Nonetheless, she smoked one to one-and-a-half packs of cigarettes per day, and had never started using Chantix despite receiving a prescription in January 2008. (Tr. at 310, 315-16.) Her neck was supple and normal on examination. (Tr. at 315.) She returned later that month, again received instructions to stop smoking; she admitted the Chantix prescription remained unfilled. (Tr. at 300, 337.) The examination results were normal, though no specific findings were made about her back. (Tr. at 300-01, 336-37.) She complained that her face tingled occasionally, her left eye drooped, and she experienced severe headaches; but no other concerns were flagged. (*Id.*) A subsequent MRI of her brain, investigating the face tingling and related issues, failed to uncover any abnormalities. (Tr. at 334, 413, 463.) Similarly, diagnostic testing of her chest did not suggest any abnormalities. (Tr. at 344.)

In July 2008, a computed tomography ("CT") scan of Plaintiff's lumbar spine displayed appropriate fusion from the 2007 surgery "with no apparent abnormality." (Tr. at 404, 510.) There appeared only minimal spondylosis at Plaintiff's L5-S1 facet joints; otherwise the scans showed

no evidence of herniated discs, stenosis, or concerns with the nerve roots. (*Id.*) MRI results in August found mild degenerative changes at C6-C7 and, at C7-T1, "a tiny . . . disc protrusion" that did not impinge nerve roots. (Tr. at 384.)

Plaintiff visited Dr. Grace Boxer in July, discussing results from recent blood count studies showing mildly elevated white cell level. (Tr. at 332, 461.) Her only complaints were fatigue and back pain. (*Id.*) Dr. Boxer thought that smoking and chronic bronchitis were the root causes of the blood count issue. (*Id.*) She should stop smoking, Dr. Boxer recommended, and perhaps try Chantix again. (*Id.*)

In August, her chronic cough persisted, diagnosed as chronic obstructive pulmonary disease ("COPD"). (Tr. at 451-52, 457-58.) She also had developed anxiety. (Tr. at 451-52.) Chest x-rays were normal. (Tr. at 453.) Plaintiff continued to complain of an unshakable cough, and also back pain, in late October. (Tr. at 449-50.) She finally started taking Chantix, but had not stopped smoking. (Tr. at 459.) Results from an MRI of Plaintiff's lumbosacral spine in late November showed the surgical fusion at L5-S1 remained unchanged from a February study. (Tr. at 378, 442.) The radiologist concluded, "There is no evidence of disk herniation, central spinal stenosis, or compromise to the neural elements." (*Id.*) An MRI of her cervical spine also appeared similar to previous results: the degenerative disk disease persisted, "predominantly at C6-7"; a broad-based, yet "[v]ery small," disk bulge was noted at C7-T1; but the radiologist did not detect any evidence that the issues compromised her nerve roots. (Tr. at 379, 382-83, 443.) Finally, the thoracic MRI was normal, as it was in April. (Tr. at 335, 365, 381, 445.)

Dr. Lis-Planells examined Plaintiff that month. (Tr. at 541.) Her "burning" neck pain was her main concern and the examination showed cervical and lumbar trigger points, but no spasm.

14

(*Id.*) Her straight-leg raise test was negative, but her bending was "[l]imited." (*Id.*) Strength and coordination remained intact, her gait was normal, and she walked on her heels, toes, and in tandem without difficulty. (Tr. at 542.) He noted that the pain treatments did not give successful long-term relief, but he recommended that she continue with them. (Tr. at 543.)

In September, Plaintiff informed Dr. Lis-Planells that her back pain was "slowly improving" and that her neck pain continued. (Tr. at 539.) He reviewed diagnostic studies and was satisfied that the surgical implementations from the 2007 procedure remained "in good anatomical position" and fusion was adequate. (*Id.*) The cervical MRI showed "only mild degenerative changes" at two disc levels and no cord compression or significant herniation. (*Id.*) He thought she was "recovering well" from the procedure. (*Id.*)

In January 2009, she complained of persistent coughing and wheezing, though a respiratory examination did not reveal any retractions, rales, or rattling sounds. (Tr. at 439.) Sill coughing in May, Plaintiff went to the emergency room, describing congestion, a moderately sore through," fatigue, and shortness of breath. (Tr. at 466.) The examiner noted wheezing and rattling noises in her breathing. (*Id.*) Chest x-rays confirmed the issues, finding "increased bronchial markings consistent with [Plaintiff's] history of both asthma and smoking." (Tr. at 467, 470-71.) She was stable at discharge and instructed to see her primary physician. (*Id.*)

The problems continued throughout the month, when she arrived at Dr. Jennings's office "very" short of breath, with diffuse wheezing. (Tr. at 434.) Later that month, her cough and wheezing had "somewhat improved" and a physical examination found she breathed clearly except for wheezing. (Tr. at 432.) The respiratory problems, however, remained persistent and

uncontrolled. (Tr. at 433.) X-rays that month, ordered after she developed a persistent cough, came back negative. (Tr. at 306, 430, 470.)

X-rays of her lumbar spine in March showed that the hardware from the 2007 surgery had stayed in place, her disc alignment was satisfactory, and there was "no evidence of lumbar instability." (Tr. at 509.) Only mild narrowing and spurring at one disc level appeared in the MRI. (*Id.*) An April MRI of her cervical spine, investigating her neck pain, did not show any "appreciable changes" from the last study. (Tr. at 507-08.) A "[v]ery small" disc protrusion at C7-T1 appeared on the MRI, but was not "associated" with stenosis or nerve root impingement. (*Id.*)

In March, Plaintiff told Dr. Lis-Planells that she had been in a car accident four months ago, increasing her back pain. (Tr. at 536.) Trigger points and spasms were present on examination, and Plaintiff's right straight-leg raising test was positive. (*Id.*) Her muscle strength was normal, but her gait was antalgic. (Tr. at 536-37.) He planned epidural steroid injections, hoping they would give temporary relief. (Tr. at 537.) The injections in April provided "significant," but short-lived relief, lasting only about two weeks. (Tr. at 521, 533.) On examination, Plaintiff's arm and leg strength were normal, as were her finger movements and gait. (Tr. at 533-34.) Plaintiff walked on her heels, toes, and in tandem without difficulty. (*Id.*) Dr. Lis-Planells noted that the recent MRI and x-rays showed the herniated cervical disc, "with no significant pressure on the spinal cord," and that the lumbosacral spine at L5-S1 did not appear unstable. (Tr. at 534.)

Dr. Ravi R. Polasani examined Plaintiff's asthma and bronchial issues on June 8, 2009. (Tr. at 570-71.) Since age fourteen, Plaintiff had asthma and was hospitalized many times for related issues. (*Id.*) She used an inhaler three to four times per day and had persistent congestion, sinus

16

problems, and allergy symptoms. (Tr. at 570.) His relevant diagnoses were allergic rhinoconjunctivitis and COPD; he recommended numerous medications. (Tr. at 571.)

Her doctors completed many diagnostic studies around this time. X-rays in June 2009 found only mild degenerative changes at two disc levels. (Tr. at 506.) In August, an MRI and CT scan of her lumbar spine showed "[s]table post[-]operative changes of L5-S1 posterior spinal fusion, without evidence of disk herniation, [or] central spinal canal or neural foraminal stenosis." (Tr. at 579, 646-47.) Dr. Lis-Planells noted that month that Plaintiff's recent epidural injections had not provided any relief. (Tr. at 641.) He noted that Plaintiff sat "comfortably" and could get "on and off the examining table without difficulty." (*Id.*) Moreover, her lumbar spine range of motion was "adequate," her strength was normal, her stance was normal, she walked without difficulty, and her straight-leg raise test was negative." (Tr. at 641-42.) The MRI's showed that Plaintiff's spinal canal at L5-S1 was adequately decompressed and the surgically-implanted hardware was "in good anatomical position." (Tr. at 642.) He did not think more surgery was necessary but considered her a candidate for a spinal cord stimulator. (*Id.*)

Plaintiff saw Dr. Cecile Dadivas in July 2009. (Tr. at 733.) She was smoking one pack of cigarettes per day, Plaintiff estimated. (*Id.*) She occasionally walked for exercise. (*Id.*) The examination showed that her neck was supple, her breathing sounded normal, her musculoskeletal system was normal, and she did not have anxiety or depression. (Tr. at 734.) Dr. Dadivas "strongly advised" Plaintiff to quit smoking. (*Id.*) They met again in November, with almost identical examination results; Plaintiff's lumbar spine was tender on palpation. (Tr. at 730-31.)

In September 2009, Plaintiff began seeing Dr. Robert Albertson, a pulmonary consultant. (Tr. at 750.) The asthma, present since childhood, had never caused her to miss many days of

school or resulted in an overnight hospitalization. (*Id.*) She estimated that she could walk one mile "[o]n a good day . . . if she took her time." (*Id.*) Her smoking had decreased to half a pack per day. (*Id.*) Dr. Albertson heard wheezes and "[a] few crackles" during the examination. (Tr. at 751.) Her muscle strength, gait, and station were normal. (*Id.*) She saw him again in October. (Tr. at 624.) She complained of shortness of breath and chronic coughing, and estimated she smoked one to one-and-a-half packs of cigarettes per day. (*Id.*) He assessed chronic asthmatic bronchitis and noted that pulmonary nodules appeared on a recent CT scan. (Tr. at 624-26.) He prescribed medications and asked her to return in six months. (Tr. at 624.)

Plaintiff returned to Dr. Lis-Planells in January 2010. (Tr. at 638.) Her pain continued and recent injections gave only temporary relief. (*Id.*) Her examination results from the prior visit remained unchanged; notably, her lumbar spine had an adequate range of motion and her muscle strength was normal. (*Id.*) She exercised at home to help the pain and also used a nerve stimulation device. (Tr. at 639.) She also saw Dr. Dadivas that month, complaining of respiratory problems. (Tr. at 727.) The examination, however, did not find any cough, dyspnea or wheezing and her neck was again supple and her musculature normal. (Tr. at 727-29.) Her asthma was well controlled with medication, Dr. Dadivas concluded. (Tr. at 729.)

She again examined Plaintiff in February, this time concerning insomnia. (Tr. at 723.) She did not awaken short of breath, or with coughing and wheezing. (Tr. at 724.) Also, she did not have any "gait disturbance." (*Id.*) Otherwise, the examination results appeared the same, and Dr. Dadivas switched her insomnia medications. (Tr. at 725.) In March, she came to Dr. Dadivas with a sore throat, congestion, and occasional coughing, but not wheezing. (Tr. at 719-21.) The remainder of the examination was unchanged. (*Id.*) The cough seems to have resolved by May. (Tr.

18

at 711-13, 715-16.) The examination results from May mirrored the prior findings; in particular, she had a normal gait and no weaknesses. (Tr. at 711-13, 715-16.)

In July 2010, she filled out an intake form prior to undergoing an MRI. (Tr. at 574.) In it, she rated her pain at level ten out of ten, and said it spread down both legs into her feet. (*Id.*) The MRI results remained unchanged from her prior study, and did not flag any new concerns. (Tr. at 576.)

Plaintiff visited Dr. Albertson in early July to discuss her pulmonary problems. (Tr. at 587-88, 614-15.) Her smoking was down to half a pack per day, (Tr. at 587), though a month before she estimated smoking one pack per day. (Tr. at 594.) Tests had revealed nodules in her chest, but these were stable. (Tr. at 587.) He determined that her cough resulted from chronic asthmatic bronchitis, gastroesophageal reflux disease ("GERD"), and chronic rhinosinusitis. (*Id.*) An esophagogastroduodenoscopy procedure had confirmed her reflux issues, but Prilosec helped. (Tr. at 587, 592-94.) A video bronchoscopy later that month confirmed the chronic bronchitis and did not reveal any other issues accounting for her cough. (Tr. at 584-85, 612-13.) In August and September, her breathing sounded regular, (Tr. at 605, 610), and during the September visit she denied experiencing shortness of breath. (Tr. at 605.) Pulmonary function tests that month were generally normal but found "evidence of air trapping," possibly related to her asthma. (Tr. at 607.) Around that time, Dr. Dadivas noted that Plaintiff did not have a cough. (Tr. at 709.) At a follow-up examination in November Dr. Albertson noted that her cough had not improved despite doubling certain medications. (Tr. at 604.) Her breathing sounds were diminished, with "scattered rhonchi" and wheezes. (*Id.*)

Spinal x-rays in September 2010 showed that the fusion had occurred, her vertebral alignment was "satisfactory," her lumbar vertebrae height was maintained, and there were "[n]o acute bony abnormalities. (Tr. at 644.) In her biannual visit with Dr. Lis-Planells, her pain persisted while standing and sitting, radiating down into her legs without causing weakness. (Tr. at 633.) She continued to exercise at home; other treatments, including epidural injections and physical therapy, were unsuccessful. (*Id.*) Straight-leg raise test results were negative, her lumbar movements showed pain, her strength was normal, diagnostic tests did not show abnormalities besides disc degeneration at one level, and she was limited in bending backwards, but her ability to bend forwards was adequate. (Tr. at 633-34.)

In October 2010, Dr. Henry Tong examined Plaintiff on Dr. Lis-Planells's referral. (Tr. at 629.) Plaintiff expressed difficulties with housekeeping, sitting, bathing, dressing, and sleeping. (*Id.*) During the examination, her breathing was clear and her strength was normal. (Tr. at 630.) She wished to continue receiving epidural injections and deferred spinal cord stimulation until the future, if necessary. (*Id.*)

Her cough had returned by October, accompanied by fever, congestion, shortness of breath, and wheezing. (Tr. at 704.) Dr. Dadivas heard mild wheezing, but thought the lungs otherwise sounded clear. (Tr. at 705-06.) The asthma was "poorly controlled," Dr. Dadivas determined. (Tr. at 706.) Plaintiff returned the next month still complaining of asthma. (Tr. at 700.) Plaintiff had not taken any medications other than her rescue inhaler, stating she was taken off Pulmicort a long time ago. (Tr. at 701.) However, Dr. Dadivas noted that the last set of notes–from October–listed it as a medication. (Tr. at 701, 706.) On examination, her wheezing was now moderate. (Tr. at

20

702.) She was encouraged to take Pulmicort and stop smoking; she "strongly" rejected the latter piece of advice, denying any "plans or desire to quit . . . ." (Tr. at 702, 744.)

Plaintiff's chest CT scan in January 2011 uncovered small lymph nodes and calcified granuloma "consistent with old granulomatous disease . . . ." (Tr. at 581-82, 602-03, 661-62.) Some of these nodes had appeared in an April 2010 CT scan. (Tr. at 598-99, 663-64, 670-71.) On January 20, 2011, she saw Dr. Albertson to discuss the CT scan results. (Tr. at 600.) Her lungs sounded normal. (*Id.*) Dr. Albertson noted the nodules, stating they had been present since October 2009, and requesting she return in six months. (Tr. at 600-01.)

In May 2011, Plaintiff complained to Dr. Dadivas that her back pain–located in her upper and lower back, as well as her neck–had worsened, radiating into her arms. (Tr. at 695.) Nearly everything aggravated her pain: daily activities, lying down, and resting. (*Id.*) Her insurance stopped covering most of her medications, preventing her from taking them. (*Id.*) She was "[n]egative for cough, dyspnea and wheezing," her neck was supple, her breathing sounded clear, her spine was tender, her straight-leg raise tests were negative, her cervical spine range of motion was "mildly reduced," she had no motor weakness, and her gait and balance remained intact. (Tr. at 697-98.)

The following month, Plaintiff went to the emergency room after four days of fatigue, "chest congestion, shortness of breath, wheezing, and sinus pressure." (Tr. at 754-55.) Her neck was supple and the examiner heard only a "[f]ew scattered wheezes" and no cough. (Tr. at 755.) She was discharged the same day with prescriptions. (Tr. at 756.) Later that month, Dr. Albertson ordered a chest CT scan. (Tr. at 763, 791.) It showed the nodes, characterizing them as small,

benign granulomas and the radiologist determined that "[n]o further followup is . . . necessary." (Tr. at 764, 792.) The scan also showed mild COPD, but no "acute pulmonary process." (*Id.*)

In August, Plaintiff informed Dr. Lis-Planells that she had been under significant stress, but denied depression or suicidal ideation. (Tr. at 765.) Plaintiff's lumbar spine range of motion was "adequate," her strength was normal, she had normal stance, she walked without difficulty, and her straight-leg raise test was negative. (Tr. at 765, 767-68.) Her most recent MRI showed fusion at L5-S1 without "evidence of recurrent disc herniation and no significant canal or foraminal narrowing." (Tr. at 768-69, 777.) Likewise, the L4-L5 disc was not herniated or degenerating and the radiologist did not see any significant surgical scarring. (*Id.*) X-rays that month suggested only mild degenerative changes at two disc spaces. (Tr. at 768.) Dr. Lis-Planells wrote, "Ms. Johnson presents with overall improvement of back and radicular pain following fusion. She has residual back pain that is well controlled with current medication." (*Id.*) They planned to continue periodic appointments. (*Id.*) Dr. Lis-Planells advised her to continue the home exercise program, avoid repetitive bending, and lift nothing above thirty pounds. (*Id.*)

Plaintiff saw Dr. Dadivas in October 2011 with a urinary track infection and associated back pain. (Tr. at 770.) She smoked one pack of cigarettes per day and occasionally exercised. (Tr. at 771.) On examination, she did not cough, wheeze, and her gait was undisturbed. (Tr. at 772.) The notes state she did not have psychiatric symptoms, but that depression was a possibility; she denied anxiety and suicidal ideations. (Tr. at 772-73.) Her neck was supple, her breathing clear, and her back tender. (Tr. at 773.)

On New Year's Eve, 2011, Plaintiff was found at a cemetery asleep in her car next to an empty pint of alcohol. (Tr. at 779.) In the triage, Plaintiff's lugs were clear with unlabored

breathing. (*Id.*) Later, she admitted "some feelings of wanting to die," but she "adamantly denie[d] suicidal ideation" or any plan or intention to kill herself. (Tr. at 780.) During her physical examination, her neck was supple, her breathing remained clear and normal, but the neurological and musculoskeletal portions were difficult to conduct and unreliable due to her intoxication. (Tr. at 781-82.) By the time she had sobered and was ready for discharge, she could stand and walk without difficulty. (Tr. at 785.)

### 2.    Medical Source Opinions and Plaintiff's Forms

On July 7, 2008, William Robbins, presumably a physician, completed a residual function report.[4] (Tr. at 323-30.) He listed the following limitations: Plaintiff could occasionally (one-third of the workday) lift twenty pounds; frequently lift ten pounds (two-thirds of the workday); sit and "[s]tand and/or walk" for six hours each in an eight-hour workday; and she could occasionally climb stairs and ladders, balance, stoop, kneel, crouch, and crawl. (Tr. at 325.) There were no other limitations. (Tr. at 326-30.)

Dr. Lis-Planells filled out a short form on March 25, 2009. (Tr. at 464.) He included three chronic and ongoing diagnoses expected to last Plaintiff's lifetime: cervical disc herniation, lumbar disc degeneration, and radiculopathy. (*Id.*) He left multiple questions blank, including whether she needed assistance in various personal care activities. (*Id.*) Concluding, he asserted that she could not work at all. (*Id.*)

In August 2009, mental and physical functioning reports were completed, again apparently for an earlier application. (Tr. at 547-68.) Dr. Rom Kriauciunas found that she had no medically

---

[4] This appears to have been completed for an initial determination on a prior application. As noted, the record does not detail that application.

determinable mental impairment. (Tr. at 60, 547.) Plaintiff's physical restrictions, established by

Dr. B. Choi, matched Dr. Robbins's 2008 assessment except she could frequently balance and

should avoid concentrated exposure to fumes, odors, and hazards. (Tr. at 62-69, 561-68.)

Dr. Lis-Planells wrote a "To Whom It May Concern" letter on March 23, 2011. (Tr. at 627,

753.) Plaintiff's current diagnoses were lumbar spondylolysis, lumbar spondylolisthesis, and

lumbar disc degeneration. (*Id.*) He explained that Plaintiff had a history of back pain, treated with

him annually, and also received epidural injections and physical therapy. (*Id.*) He said that "it is

my opinion that Ms. Johnson has been disabled from work and given her spinal pathology, I

anticipate that she will continue to be disabled in the future." (*Id.*)

Dr. Dadivas completed a medical form with information from Plaintiff's last physical

examination in May 2010. (Tr. at 739-40.) The medical impairments included asthma and COPD;

Plaintiff was ambulatory, had a chronic cough but no shortness of breath, her lungs were clear, her

strength was normal, and she showed no unusual anxiety or depression. (*Id.*) Her condition was

stable and Plaintiff could meet her personal care needs. (Tr. at 740.)

Dr. Dadivas completed a more comprehensive report on June 29, 2011. (Tr. at 759-62.) The

diagnoses now included asthma, COPD, a blood cell disorder, hyperlipidemia, and chronic back

pain. (Tr. at 759.) Her symptoms were back pain and wheezing and the only listed treatment was

Vicodin. (*Id.*) Emotional factors did not "contribute to the severity" of Plaintiff's symptoms,

though Dr. Dadivas noted that depression affected her physical condition. (*Id.*) The pain was

severe enough to disrupt her attention and ability to remain on task seventy-five percent of the

time. (Tr. at 760.) Likewise, Plaintiff had a marked limitation in her ability to deal with work-

related stress. (*Id.*) Plaintiff could walk one-half of a block, sit for ten minutes at a time and less

than two hours in total during a workday, occasionally lift less than ten pounds, and stand for fifteen minutes. (*Id.*) Plaintiff would need to walk for ten minutes eight times per day, and would need a position that allowed her to shift, at will, between sitting, standing, and walking. (Tr. at 760.) Moreover, Plaintiff would need ten- to fifteen-minute breaks every half hour, and her legs would need to be elevated to hip level for three-fourths of the workday. (Tr. at 761.) She also suffered significant limitations in reaching (which she could not do at all), handling, and fingering; the last two actions she could do during only half of the workday. (*Id.*) Bending and twisting at the waist was impossible. (*Id.*) Finally, she would miss more than three days of work per month. (Tr. at 762.)

Dr. Myung Ho Hahn completed a functional capacity assessment on July 22, 2011, after reviewing the medical evidence. (Tr. at 76-78, 87-89.) Dr. Hahn considered whether Plaintiff met Listing 1.04, and determined that an RFC assessment was necessary, indicating Plaintiff neither met nor equaled the listing. (Tr. at 76, 87); (Doc. 15 at 6-7). The RFC he posited largely matches the prior restrictions by Dr. Robbins and Dr. Choi: the lifting, sitting, and standing limitations are the same; Plaintiff now could now frequently climb stairs; had no manipulative limitations; and had a few additional environmental limitations. (Tr. at 77-78, 88-89.)

Plaintiff's mother, Kristine Boyd, also provided an affidavit describing her daughter's restrictions. (Tr. at 279-80.) According to Ms. Boyd, Plaintiff could not lift anything over five pounds; sit or stand in place for more than five minutes; or vacuum. (Tr. at 279.) She used an electric cart when she shopped, frequently lost her breath, took pain pills, and struggled to sleep. (Tr. at 279-80.)

25

Plaintiff filled out three functional capacity report forms and three asthma report forms. (Tr. at 211-31, 254-63.) The first, from June 2008, states that on a typical day she took medication in the morning, dressed, brushed her teeth, watched television, and attended her children's sporting events, sitting in the car and occasionally standing outside. (Tr. at 211.) She then said she does not take care of children or pets, but that her children help take care of each other and Plaintiff. (Tr. at 212.) Personal care was difficult, particularly anything that required bending or sitting. (*Id.*) She required assistance cooking because she was "not suppose[d] to lift over [five pounds]." (Tr. at 213.) That five pound limit, she asserted, applied "for the rest of my life . . . ." (Tr. at 216.) Her children did most of the housework, though she could do some cleaning. (Tr. at 213.) She left the house everyday, usually to attend appointments, transport her children, or shop. (Tr. at 214.) She could drive and travel alone. (*Id.*) Financial responsibilities did not present any problems. (*Id.*) Social activities included talking to others on the phone and visiting family. (Tr. at 215.) Her impairments affected almost every physical ability except reaching and using her hands. (Tr. at 216.) She estimated that one-quarter of a mile was the farthest she could walk before resting for three to five minutes. (*Id.*)

Her concentration and ability to complete tasks, follow instructions, and get along with authority figures were unimpeded. (Tr. at 216-17.) She handled stress "alright." (Tr. at 217.) Her doctors prescribed a brace and a bone stimulation device after her surgery. (*Id.*) She added that after her 2007 surgery, she used a cane for three months, and still occasionally used it to help her stand up. (Tr. at 218.) Apparently, Dr. Lis-Planells recommended applying for disability benefits. (*Id.*)

The second capacity report, completed the following year, generally matches the first. (Tr. at 222.) During a typical day, in addition to her previous activities, she talked to her mother, prepared dinner, took three breathing treatments, visited with her children, watched television, and sometimes played cards with her children. (*Id.*) She had two sons, ages twelve and fourteen, that she took care of, along with pets. (Tr. at 223.) Her children, including an eighteen year old, helped her "with . . . everything." (*Id.*) Personal care activities that required sitting or bending still were a struggle. (*Id.*) Her sons helped her cook complete meals. (Tr. at 224.) She could do light household work, but her sons did most of it. (*Id.*) She could still drive a car, shop, travel alone, and handle money. (Tr. at 225.) Watching television and visiting family remained her main hobbies, and she routinely went to watch her children's sporting events. (Tr. at 226.) Along with her prior difficulties, she now struggled to reach and concentrate. (Tr. at 227.) She no longer used the bone stimulation device but now had a breathing machine, stating that it was prescribed after her 2007 surgery. (Tr. at 228.)

The final report, completed for the present application, generally matches the first two. (Tr. at 254-61.) She now lived with her boyfriend or grandmother. (Tr. at 254.) During the day she showered, dressed, used her TENS unit and heating pads, wore a back brace, picked her children up from school, and made dinner with her children. (Tr. at 255.) Sometimes, her leg pain was so great that pushing the pedal while driving was unbearable and her children then would drive. (*Id.*) She could cook, with her children lifting any heavy objects. (Tr. at 256.) Light housework was bearable, but her children cleaned as well and did all of the outside work. (Tr. at 256-57.) She now only left her house once or twice per week. (Tr. at 257.) Her hobbies also included watching her granddaughter. (Tr. at 258.) She saw family every day and continued shopping and attending her

sons' events. (*Id.*) The list of impaired abilities still included reaching and most other physical tasks, but she no longer struggled to concentrate. (Tr. at 259.) Epidural injections provided only a few days of relief. (Tr. at 261.)

Her first asthma report form was completed in 2008. (Tr. at 219-21.) She asserted that jogging, fast walking, using stairs, exercising, perfumes, and humidity brought on asthma attacks, which generally lasted a half hour. (Tr. at 219.) Only one hospitalization had occurred in 2008 due to asthma, she wrote. (Tr. at 220.) In the past, she took her breathing machine to work, but supervisors were reluctant to give her time to use it. (*Id.*) Occasionally, the asthma caused her to miss work. (Tr. at 221.) The second form, completed in 2009, updates medication and asthma attack episodes, but does not add much else. (Tr. at 230-31.) In her last report, she wrote that she had experienced one asthma attack since filling out the previous form two years prior. (Tr. at 262.) She now estimated that the attacks lasted fifteen to thirty minutes, though breathing was difficult for the remainder of the day. (Tr. at 262-63.)

### 3. Administrative Hearing

Plaintiff attended an administrative hearing on May 16, 2012. (Tr. at 30.) Her attorney began by noting the prior adverse initial decisions and the possibility that they would need to be reopened. (Tr. at 33.) Plaintiff then described the basis for her claim. (Tr. at 34.) Her back hurt constantly, preventing her from sitting or standing for any appreciable period; a new disc was potentially "pinching" a nerve, her cervical spine contained a herniated disc, a disc bulged in her mid-back, various discs had degenerative disease, and she was "very, very depressed." (*Id.*) On top of this, she lost her house, car, and cell phone. (*Id.*)

28

The ALJ then began the questioning. (*Id.*) She last worked in September 2007, before her surgery, as a bartender, cook, cleaner, and cashier at a restaurant. (Tr. at 34-35.) Her smoking was down to half a pack per day, which impeded her efforts to improve her breathing but was a dramatic drop over the past year from two-and-one-half packs. (Tr. at 35-36.) Even then, however, she managed to bum her daily allotment from family and friends, not paying for a single cigarette herself. (*Id.*) Sleep came fitfully due to back pain and coughing attacks. (Tr. at 36.) The pain a pinched sciatic nerve, she stated, adding, "It was pinched off when I had the surgery in '07 and after the surgery it was fine." (*Id.*) Now, her disc at "L4" was "bone on bone" with the sciatic nerve pinched in between, replicating the conditions prior to her 2007 surgery. (Tr. at 36.) The pain became "unbearable" at times, a constant ache in her legs, back, and hips. (Tr. at 37.) She added, "My doctor will not release me back to work." (Tr. at 34.)

The ALJ then jumped to Plaintiff's personal situation. "[A]ny vacations or trips over 100 miles" since 2007? he wondered. (Tr. at 36.) In 2009 she went to South Carolina with her children–they drove her there and back. (Tr. at 36-37.) Her finances were now in shambles. (Tr. at 37.) After her grandmother's house was sold she was forced to the streets and she feared she would lose her children. (*Id.*) Various family and friends gave her a place to stay, but she still felt as though she lived "day by day." (*Id.*)

She had an upcoming spinal MRI and had scheduled more epidural injections. (Tr. at 37-38.) Her doctor was "pretty sure" she would eventually need surgery. (Tr. at 38.) At this point, she seems to have stood up or shifted in her seat, and the ALJ told her she could stand or sit as needed. (*Id.*) Returning to her treatments, she said that injections helped ease the pain, never eliminating

it. (*Id.*) She also took Vicodin, which, like other medications, caused drowsiness. (*Id.*) Finally, just the previous day, she went to the emergency room due to her asthma. (Tr. at 39.)

Her attorney then asked whether her condition vacillated. (*Id.*) At least five days a week were "bad," she responded. (Tr. at 40.) The pain varied with her activities; for example, whether she had "to drive to doctors" and how long she sat. (*Id.*) During "bad" days she used the TENS unit every fifteen minutes over a four to six hour period, took extra pain medication, went to the emergency room, used her cane, or elevated her legs. (*Id.*) Her leg was sitting atop a chair during the hearing, the attorney pointed out. (*Id.*) She also wore a back brace, except during sleep, and used a medical reacher device to grab objects she could not bend to reach. (Tr. at 41.) The cane went with her outside the house, especially when shopping, although sometimes she rode in electric carts. (Tr. at 41-42.) Later, the attorney inquired about her mental problems. (Tr. at 50.) "I'm majorly [sic] depressed," Plaintiff explained, and "tried to commit suicide on . . . [December 31] . . . ." (*Id.*)

The vocational expert ("VE") then testified, first describing her past work: she was a bartender, cashier, and stocker, each with different skill and exertional levels–the first three light, the last medium. (Tr. at 44.) The ALJ then asked the VE to

> assume a hypothetical individual the claimant's age and education with the past jobs that you described. Further assume that this individual is limited to light work as defined in the regulations with further modifications. And that would be lifting and carrying occasionally up to 20 pounds and frequently up to 10 pounds. Sitting would be six out of an eight[-]hour day. Standing would be limited to four out of an eight hour day with [the option] . . . to alternate to sitting for five minutes of every half hour that with [sic] standing. Pushing and pulling would be limited to that as the lifting and carrying. On climbing ramps and stairs [sic] would be limited to occasional. Climbing ladders and scaffolds would be never. Balance, stooping, kneeling and crouching would be occasional but crawling would be never. And there would be no concentrated exposure to dust, fumes or industrial chemicals.

(*Id.*) Could that individual perform Plaintiff's past work? he asked. (*Id.*) No, the VE replied, but other jobs would be available: small products assembler (2100 position in Michigan's lower peninsula); routers (5000 positions); inspectors and hand packagers (1100 positions). (Tr. at 45.)

The VE stated that employers expect employees to remain on task during eighty-five percent of the workday and not miss more than one day per month; lower percentages of on-task time or higher absenteeism rates would preclude work. (Tr. at 45-46.) Elevating a leg five inches off the ground likely would not present problems; raising it six inches or higher would affect work prospects, while waist-high elevation would preclude work altogether. (Tr. at 46.)

Plaintiff's attorney then reiterated some of the ALJ's questions. (Tr. at 47-48.) Continuing, he asked how restrictions on bending and twisting affected work. (Tr. at 48.) "Bending and twisting typically are not part of the jobs that I described," the VE responded, so they were not necessary abilities. (*Id.*) While bending and twisting were not addressed in the Dictionary of Occupational Titles ("DOT"), the VE interpreted the DOT to implicitly include them in postural restrictions such as balancing, stooping, and kneeling. (Tr. at 48-49.) The attorney then asked whether a fifty-percent restriction in fingering and handling, and no reaching, would eliminate the jobs above. (Tr. at 49.) It would, the VE agreed. (*Id.*)

## F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that Plaintiff had the RFC to

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Claimant can lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently. In an eight-hour workday, claimant can sit for six hours and stand/walk for four hours. She should be able to alternate sitting/standing for five minutes of every half hour but otherwise can stay on task. She cannot use foot controls with either lower extremity and cannot crawl, or climb ladders, ropes, or scaffolds. She can

31

occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. Claimant cannot have concentrated exposure to dust, fumes, or industrial chemicals.

(Tr. at 21.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.      Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff has three complaints with the ALJ's findings. (Doc. 15 at 11-22.) First, she says she met or equaled listing 1.04A. (*Id.* at 11.) The listings, set out in an appendix to the regulations, detail particular impairments the Commissioner "consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a), 416.925(a). Listing 1.04A deals with spinal disorders

evidenced by nerve root compression. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A. Plaintiff points out that the ALJ never explicitly analyzed that listing, instead simply asserting he had considered it. (Doc. 15 at 12 (citing Tr. at 20).) She then explains that pre-surgery testing showed nerve root impingement. (*Id.*) Carefully culling the post-surgery evidence, she selects a few pieces demonstrating her continuing pain and test results that potentially met listing 1.04A. (*Id.* at 13.) She ends by quoting the listing without ever precisely, or even opaquely, matching its discrete elements to the present facts. (*Id.* at 13-14.)

Defendant responds that the ALJ did consider the listing and that Plaintiff carries the burden at the third stage. (Doc. 18 at 10.) She failed, according to Defendant, because the listing requires evidence that the back disorder compromises a nerve root or the spinal cord, yet the record did not contain any such evidence. (*Id.* at 10-12.) Citing the Supreme Court's decision in *Zebley*, Defendant adds that to meet a listing, a claimant must satisfy all of its criteria. (*Id.* at 12 (citing *Zebley*, 493 U.S. at 530).) Here, Plaintiff did not provide evidence of any "nerve root compression causing motor and sensory loss," required in listing 1.04A. (*Id.*)

Plaintiff replies that *Zebley* discussed a now-rescinded Social Security Ruling in "a kid's case," meaning it dealt with minors' disabilities employing different regulations; therefore, she concludes it "is not precedential in the current context." (Doc. 19 at 1.) Yet, she seems to pare back her previous argument, focusing now on the assertion that Plaintiff equaled the listing: "Our position is that she has proved those elements necessary to at least equal Listing 1.04." (*Id.* at 1.) In particular, the MRIs showed two herniated discs; a physician spotted one before the surgery and operated on it, but Plaintiff never cites or discusses the second MRI. (*Id.*) The surgery did not alleviate the back pain, nor did other treatments. (*Id.*) The pain was spreading and her gait was

33

limited. (*Id.* at 2.) She concludes that the ALJ's cursory statement regarding the listing deprives the court of the "ability to see how he analyzed the medical evidence . . . to reach his conclusion." (*Id.*)

Second, the ALJ failed to weigh adequately the treating physicians' opinions and also did not use the regulatory factors to explain these findings. (Doc. 15 at 14-18.) Treating physicians are sometimes entitled to controlling weight, and when not, the ALJ must give "good reasons" for according them less deference. 20 C.F.R. §§ 404.1527(c), 416.927(c). Plaintiff argues the lack of substantial objective support merely knocks the treating opinion out of the "controlling weight" category; the ALJ must still provide other "good reasons" for not deferring to them. (Doc. 15 at 15-16.) She then attacks the ALJ's treatment of Dr. Dadivas's opinion, contending that other opinion and objective evidence supported Dr. Dadivas. (*Id.* at 16-17.) Next, the ALJ botched his analysis of Dr. Lis-Planell's opinions. (*Id.*) The ALJ used Dr. Lis-Planell's proposed thirty-pound lifting restriction to discredit Dr. Dadivas's opinion that Plaintiff could only occasionally lift less than ten pounds. (Tr. at 22.) But Plaintiff rejected Dr. Lis-Planells's other opinions that actually precluded work and, in any case, the "weight [restriction] had nothing to do with the opinions of disability." (Doc. 15 at 17.) Further, the ALJ did not include the bending restrictions Dr. Lis-Planells offered. (*Id.*) Yet, a treating source's proposed RFC can be entitled to controlling weight. (*Id.* (citing *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 727 (6th Cir. 2014)).) She ends with a series of quotations regarding treating source opinions. (*Id.* at 17-18.)

Defendant thinks that the ALJ's treating opinion analysis was acceptable. (Doc. 18 at 12-16.) Citing the ALJ's handling of Dr. Lis-Planell's second opinion statement–from August 2011, asserting Plaintiff could lift thirty-pounds–Defendant contends that "Dr[]. Lis-Planells'[s] opinion

that Plaintiff could not work conflicted with a subsequent opinion from him." (*Id.* at 13.) The second opinion came after Dr. Lis-Planells found Plaintiff had improved. (*Id.* at 15.) Plaintiff's contention that the ALJ cherry-picked Dr. Lis-Planell's restriction is mistaken: the ALJ adopted neither opinion. (*Id.* at 16.) Dr. Dadivas's opinion that Plaintiff could not sit or stand for over fifteen minutes clashed with objective evidence that consistently failed to reveal abnormalities. (*Id.* at 13-14.) Her handling, fingering, and reaching restriction also lack any corroborating evidence. (*Id.* at 14.)

Plaintiff's response centers on the length and depth of the sources' relationships with Plaintiff. (Doc. 19 at 2-4.) After establishing that the sources had ample opportunity to examine Plaintiff and were concerned about her health, she notes Dr. Dadivas's opinion that Plaintiff would often be off task. (*Id.* at 3.) The "clear" proof of this is that she "sees 4 doctors on a regular basis and goes to the hospital too." (*Id.*) She cites nothing else establishing her likely absenteeism. The rest of her response to the treating source claim deals with Plaintiff's credibility, a separate issue that she addresses in her third claim.

Finally, Plaintiff argues that the ALJ improperly analyzed her credibility. (Doc. 15 at 18-22.) She first attacks the ALJ's use of boilerplate language suggesting he reversed the credibility analysis by assessing her ability to work before analyzing her credibility. (*Id.* at 19-20.) This "gets things backwards," as the credibility of Plaintiff's subjective complaints plays a role in determining her ability to work. (*Id.* at 19.) Next, she lambastes the ALJ for discounting her testimony that Dr. Lis-Planells never "released [her] to return to work . . . ." (*Id.* at 19-20.) At the hearing, she stated her doctor would not authorize her return to work, (Tr. at 34); the ALJ said "there is no evidence to support her statement." (Tr. at 22.) Plaintiff points out, however, that Dr. Lis-Planells's March

35

2011 letter states was disabled. (Doc. 15 at 20 (citing Tr. at 753).) Also, Plaintiff argues her complaints were consistent and she made persistent but unsuccessful efforts to treat her pain. (*Id.* at 20-21.) Finally, she asserts that the ALJ erred by ignoring her mother's affidavit. (*Id.* at 21-22.)

Defendant rejects Plaintiff's complaints about the boilerplate language and suggests that, in any case, the ALJ gave other reasons for his findings. (Doc. 18 at 17.) Further, the ALJ discussed objective evidence, including the MRIs and Dr. Lis-Planells's final assessment in August 2011 noting improvement. (*Id.* at 17-18.) Plaintiff's continued smoking likewise provided cause to discount her respiratory problems. (*Id.* at 18.) Concerning Plaintiff's testimony that she was not released to work, Defendant contends that "[i]t is not unreasonable to expect that a surgeon [like Dr. Lis-Planells] would monitor a patient's progress following surgery and discuss when she could return to work." (*Id.* at 19.) This never occurred, according to Defendant. (*Id.*) Next, the ALJ did consider Plaintiff's treatment attempts. (*Id.*) Finally, Defendant argues that the ALJ does not need to "discuss every statement from a non-medical source in every decision," and that here, Plaintiff's mother did not provide any new information. (*Id.* at 20.) Plaintiff's reply points out that she submitted a lengthy medical record, seems to suggest that the ALJ ignored much of the evidence, and concludes that he could not discredit her testimony simply because objective medical evidence failed to substantiate her claims. (Doc. 19 at 4-5.)

### a.    Listing 1.04A

#### i.    Governing Law

Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful

activity, not just substantial gainful activity. *See Zebley*, 493 U.S. at 525; 20 C.F.R. pt. 404, subpt.

P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the

criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet

the listing. *Id. See also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those

criteria, no matter how severely, does not qualify."). Alternatively, medical equivalence of a

Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity
> or findings, yet has "other findings" that are "at least of equal medical significance"
> to the criteria; (2) the claimant has a non-listed impairment that is at least of equal
> medical significance" to a listed impairment; or (3) the claimant has a combination
> of impairments which do not individually meet a Listed Impairment, but are "at least
> of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R.

§ 404.1526).

   The ALJ retains discretion at this stage, and does not need to attach "any special

significance to the source of a[] [medical] opinion . . . [regarding] whether an impairment meets

or equals a listing." 20 C.F.R. § 404.1527(d)(3). This is particularly true for the first part of the

analysis: "'[A]n ALJ is capable of reviewing records to determine whether a claimant's ailments

*meet* the Listings . . . .'" *Stratton v. Astrue*, 987 F. Supp.2d 135, 148 (D. N.H. 2012) (quoting

*Galloway v. Astrue*, No. H-07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008)). The

Commissioner, however, has qualified the ALJ's discretion to decide equivalence, noting that

"longstanding policy requires that the judgment of a physician (or psychologist) designated by the

Commissioner on the issue of equivalence on the evidence before the administrative law judge or

the Appeals Council must be received into the record as expert opinion evidence and given

appropriate weight." SSR 96-6p, 1996 WL 374180, at *3. An expert's opinion in a Disability

37

Determination Transmittal Form can satisfy this requirement. *Hayes v. Comm'r of Soc. Sec.*, No. 11-14596, 2013 WL 766180, at *9 (E.D. Mich. Feb. 4, 2014), *Report & Recommendation adopted*, 2013 WL 773017 (E.D. Mich. Feb. 28, 2013).

The ALJ's step-three explanation is held to the same standard as the rest of the decision, and the ALJ does not need to "spell[] out every consideration that went into the step three determination" or recount every fact discussed elsewhere in the decision. *Bledsoe v. Barnhart*, 165 F. A'ppx 408, 411 (6th Cir. 2006). The ALJ does not need to use a particular format, and reviewing courts will read the decision "as a whole . . . to ensure there is sufficient development of the record and explanation . . . ." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that the ALJ does not need "to use particular language or adhere to a particular format in conducting his analysis"). Nor does the ALJ need to place the entire analysis underneath the "Listing" heading; the court can examine the ALJ's entire decision to decide whether the step three analysis is adequate. *See White v. Colvin*, No. 4:12-cv-11600, 2013 WL 5212629, at *7 (E.D. Mich. Sept. 16, 2013) (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). The claimant carries the burden of proof at step three and therefore, as the Third Circuit has observed, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that she meets the Listing. *Ballardo v. Barnhart*, 68 F. App'x 337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment").

In *Retka v. Commissioner of Social Security*, decided before SSR 96-6p was issued, the Sixth Circuit's analysis somewhat adumbrated *Ballardo*. 70 F.3d 1272, 1995 WL 697215, at *2 (6th Cir. 1995) (unpublished table decision). The Sixth Circuit noted the need for expert opinions

on equivalence, but quickly shifted the focus to the "claimant's burden . . . to bring forth evidence to establish that he or she meets or equals a listed impairment." *Id.* The ALJ had scoured the record, found that the plaintiff had produced no evidence supporting disabling pain, and thus the Court rejected the attack on the decision. *Id.* "The absence in the record of medical evidence showing significant neurological deficits and muscle atrophy supports the ALJ's conclusion . . . . [And] [t]hus, there is no merit to the plaintiff's argument that the ALJ erred in failing to find his condition equivalent to the Listing . . . ." *Id.* As the Circuit stated elsewhere, "When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) (citation omitted). Consequently, an ALJ's Listing analysis must be viewed in light of the evidence the claimant presents.

Listing 1.04 can be met in three ways, but the relevant one here is evidence of nerve root compression. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. To fulfill the criteria, the claimant must demonstrate a disorder that results "in compromise or a nerve root . . . or the spinal cord." *Id.* The claimant must provide accompanying "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.*

Cases discussing compression vary in their analyses. Some look for concrete proof of actual compression, rather than mere suggestions that a nerve root is affected, to trigger further inquiry or otherwise support the claimant. *See, e.g.*, *Adams v. Comm'r of Soc. Sec.*, No. 13-11132, 2014

WL 897381, at *9 n.5 (E.D. Mich. Mar. 6, 2014) (noting that recent MRI results would not have altered the ALJ's decision on nerve root compression because they "indicate only that a disc protrusion 'abuts the S1 nerve roots,' not that there is evidence of nerve root compression") (adopting Report and Recommendation); *Barnes v. Comm'r of Soc. Sec.*, No. 12-CV-15256, 2013 WL 6328835, at *9 (E.D. Mich. Dec. 5, 2013) ("[Claimant's] x-ray and CT scan show degenerative disc disease and spinal canal stenosis, but there is no mention of nerve root compression in the radiologist's reports."). One court noted that "none of the medical records expressly state that plaintiff suffers from nerve root compression. An implication, based on radiating pain, is not enough to satisfy the Listing [1.04]." *Miller v. Comm'r of Soc. Sec.*, 848 F. Supp. 2d 694, 709 (E.D. Mich. 2011) (adopting Report & Recommendation). Further the plaintiff there did "not point to any positive straight[-]leg raising tests in both the sitting and supine positions. Absent such results, a plaintiff cannot meet the listing." *Id.* (citations omitted). Others treat a broader range of descriptions in the treatment notes as representing compression. *See, e.g.*, *Thomas v. Comm'r of Soc. Sec.*, No. 12-14758, 2014 WL 688197, at *6-8 (E.D. Mich. Feb. 21, 2014) (finding that nerve root impingement was equal to nerve root compression).

The Sixth Circuit has addressed the "strict requirements" of this Listing. *Lawson v. Commissioner of Social Security*, 192 F. App'x 521, 529, 530 (6th Cir. 2006). There, the plaintiff's reflexes and range of motion were normal; accordingly she did not meet Listing 1.4A. *Id.* at 529-30. The court rejected the plaintiff's attempt to merge a degenerative disc diagnosis into Listing 1.04. *Id.* 529-30.

> Lawson's counsel attempts to argue that Dr. Ward's diagnosis of 'severe' degenerative disc disease qualifies Lawson for disability benefits, but this bare assertion of severity and a listing of Lawson's claimed symptoms does not satisfy the analysis for disability as set

forth in the SSA's regulations . . . in the absence of evidence of specific medical findings consistent with a particular listed impairment.

*Id.* at 530.

### ii.    Analysis

I suggest that the ALJ's listing analysis was adequate. Plaintiff's criticism of Defendant's citation to *Zebley* serves as a threshold matter. (Doc. 19 at 1.) In *Zebley*, the Supreme Court cited a Social Security ruling, SSR 83-19, for the rule that claimants can meet a listing only if they "meet *all* of the specified medical criteria" in the listing. 493 U.S. at 530. The Court held that the Commissioner's rulings and regulations did not properly implement the Social Security Act's requirements regarding minors' eligibility for SSI benefits. *Id.* at 541. As Plaintiff observes, (Doc. 19 at 1), the Commissioner subsequently rescinded SSR 83-19. *See* SSR 97-7C, 1991 WL 231791, at *1. Left unmentioned by Plaintiff, however, is the fact that the Commissioner rescinded SSR 83-19 as a result of *Zebley*. *Id.* Thus, the Court favorably cited aspects of the Ruling even as it struck down the basis for that Ruling. In essence, Plaintiff's argument critiques the Supreme Court for citing with approval parts of a Ruling when it disagreed with the foundation for other pieces of the Ruling.

Moreover, even if the Court somehow undercut its reliance on SSR 83-19– in the process, casting doubt on its own preceding statement–the Court's assertion hardly needed any support. When faced with an actual listing, containing discrete elements, the Court's statement becomes a tautology: a listing that requires the claimant to meet *X*, *Y*, and *Z*, means that the claimant must "meet *all*" of those criteria. Plaintiff's odd argument finds further rejection in the regulations, which include the *Zebley* language nearly verbatim: "We will find that your

41

impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing . . . ." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). Finally, and perhaps most importantly, Plaintiff never rejects the statement's content; she never asserts either that she does not have to meet all the listing's requirements, except to the extent she equals them, or that she actually fails to meet them.

Another initial argument also fails to persuade: Plaintiff condemns the ALJ's analysis for not explicitly discussing listing 1.04. (Doc. 15 at 12.) Indeed, the ALJ mentions only that he considered and rejected the impairments in listing 1.00, which contains 1.04. (Tr. at 20.) This would represent a troubling oversight if the ALJ was required to place his listing analysis in his decision's step three section. He was not. Instead, a court can find the listing analysis sufficient by looking at the entire opinion. *See White*, 2013 WL 5212629, at *7. As a court in this District explained, the Sixth Circuit has allowed courts to scan the decision for statements that support the step three analysis, and numerous district and circuit courts have agreed. *Id.* (collecting cases).

Here, the ALJ's decision indicates he sufficiently considered the listing. As noted, listing 1.04A required Plaintiff to demonstrate compromise of a nerve root or the spinal cord, nerve root compression, limited spinal motion, muscle weakness and sensory or reflex loss, and, because she complained of lower back pain, positive straight-leg raise tests, both sitting and supine. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. The ALJ's review of the evidence, prior to step three, looked for these elements and found them missing. He noted the April 2008 MRI that failed to show "recurrent disc herniation." (Tr. at 16, 390, 399, 489, 511.) Likewise, he cited to multiple tests[5] which gave no indication "of disk herniation, central spine stenosis, or compromise to the

---

[5] These included, among others, the February 2008 x-ray of the lumbar spine that showed proper fusion and only mild disc-space narrowing, (Tr. at 318); the April 2008 thoracic spine MRI, which did not find any narrowing at that level and again only mild degeneration in the upper lumbosacral spine, (Tr. at 313); the November 2007 cervical spine MRI that found "some mild degenerative change" and disc protrusion, but no stenosis or evidence

neural elements." (Tr. at 16.) He discussed her persistent pain, but noted that in April Dr. Lis-Planells reviewed diagnostic studies showing that the surgical "hardware" had not malfunctioned and there was no recurrent herniation. (Tr. at 16, 399, 489.) X-rays confirmed the fusion, the ALJ added. (Tr. at 16, 318.) Again, he examined the August 2008 MRI for evidence implicating listing 1.04: it displayed "only mild degenerative changes" and "no evidence of cord compression or significant herniated disc." (Tr. at 16, 384.) He also stated that the November 2008 lumbar spine MRI showed "no evidence of recurrent or adjacent disc herniation, no significant spinal canal compromise, and no foraminal narrowing." (Tr. at 16, 378, 442.) Moreover, it did not show neural compromise. (Tr. at 378, 442.) Likewise, he discussed the thoracic MRI from that month which also failed to indicate any abnormalities. (Tr. at 16-17, 381.)

He also discussed 2009 test results, beginning with Dr. Lis-Planells's comment in June that recent MRIs and x-rays suggested a herniated disc, but "no significant pressure on the spinal cord." (Tr. at 17, 534.) Testing in August showed the lumbar spine did not have "disc herniation, [or] central spinal canal or neural foraminal stenosis." (Tr. at 17, 579, 646-47.) The same results were obtained in a July 2010 lumbar MRI, discussed by the ALJ. (Tr. at 17, 576.) X-rays around that time, also mentioned in the ALJ's decision, confirmed that the surgical hardware in Plaintiff's lower back remained "in [a] good anatomical position . . . ." (Tr. at 17, 639.) Finally, the ALJ also explicitly considered the test results from the August 2010 demonstrating "solid fusion . . . and no

---

of compromised nerve roots, (Tr. at 416); the July 2008 lumbar spine CT scan showing minimal degeneration, no stenosis, and "unremarkable" nerve roots, (Tr. at 404); the February 2008 lumbar spine MRI that found no evidence of compromised nerve roots or disc herniation, (Tr. at 399); the August 2008 cervical spine MRI showing only mild degeneration at two levels without "neural impingement," (Tr. at 384); the November 2008 cervical spine MRI largely mirrored later by the April 2009 study, (Tr. at 379-80), which showed "[v]ery small" disc protrusion, straightening of the cervical lordosis, and no other changes, including no "nerve impingement," (Tr. at 382-83); and the November 2008 thoracic spine MRI that was negative for abnormalities and showed no appreciable change from the April 2008 study, (Tr. at 381).

instability." (Tr. at 17, 765, 767-68.) Thus, the ALJ scanned the objective evidence to see if Plaintiff could meet listing 1.04A's elements. Though he did not repeat his analysis in the step three section of his decision, his discussion implicating the listing was explicit and conveys that he adequately considered the necessary requirements.

Substantial evidence supports his findings. Plaintiff would struggle to meet or equal any of listing 1.04A's criteria. The only evidence of a compromised nerve root came from a May 2007 MRI, prior to her surgery that decompressed the nerve roots. (Tr. at 351-53, 425.) Nearly every test to mention nerves after the surgery denied they were affected. (Tr. at 378-79, 382-84, 399, 404, 416, 425, 442-43, 507-08, 510, 579, 646-47.) Only one post-surgery study suggested "mild . . . neural foraminal narrowing, without central spinal canal stenosis," at one disc level. (Tr. at 579.) This lone observation is insufficient to support Plaintiff's case. A foramen is an opening in the spinal column through which the nerve roots pass. 2 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* F-149 (2013). If the foramen narrows enough, it can "cause pressure on the sciatic nerve roots (or rarely the cord)," a condition called spinal stenosis. Mark H. Beers & Robert Berkow, eds., *The Merck Manual of Diagnosis and Therapy* 476 (17th ed. 1999). However, narrowing can occur without causing compression. *See* Bruce H. Nowicki, et al., *Occult Lumbar Lateral Spinal Stenosis in Neural Foramina Subjected to Physiologic Loading*, 17 Am. J. of Neurodadiology 1605, 1613 (1996) (noting the implications of "CT [scans] and MR imaging [that] show narrowing of the neural foramen without nerve root compression").

Evidence of narrowing, therefore, does not unambiguously indicate compression; and even if it did, a single study would not suffice to fit Plaintiff into the listing or, given the substantial evidence to the contrary, raise significant concerns about whether she equaled the listings.

Moreover, Dr. Lis-Planells reviewed a more recent lumbar MRI, from July 2011, and determined there was "no evidence of . . . significant canal or foraminal narrowing." (Tr. at 768, 777.) He may have been discussing a different disc level; even so, he did not flag any concerning narrowing at any other level.

Next, the record contains little objective evidence that Plaintiff had limited spinal motion, muscle weakness, or loss of sensation or reflexes. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04. Her doctors consistently observed that she had a supple neck, (Tr. at 300, 310, 315, 697-98, 727-29, 734, 755, 773, 781-82), adequate spinal motion, (Tr. at 321, 638, 641-42, 765), and normal gait, walking on her toes or heels without issue, (Tr. at 321, 374, 492, 495, 503, 533-34, 542, 546, 641-42, 697-98, 711-13, 715-16, 724, 751, 768, 772, 785). She told Dr. Dadivas in July 2009 that she occasionally walked for exercise. (Tr. at 733.) Only a few notes suggest decreased range of motion in her lower back, generally only a mild reduction; one of these observations came soon after her surgery as she was still recuperating. (Tr. at 321, 494, 697-98.) The more recent notes from 2009 through 2011 almost uniformly did not indicate limited range of motion, (Tr. at 638, 641-42, 765); the one from 2011 that did found only "mildly reduced" range of motion in her cervical spine, (Tr. at 698.) Other than her trip to the emergency room while intoxicated, (Tr. at 782), the only time she struggled to walk was in March 2009, after her car accident. (Tr. at 536.) Nonetheless, the vast majority of the objective records suggest she had enough spinal motion to disqualify her from listing 1.04A.

Crediting these scattered instances of limited motion over the substantial evidence to the contrary would still leave Plaintiff short of the listing. The record lacks of any objective evidence showing sensation or reflex loss and muscle weakness. Plaintiff only mentions reflexes once in her

brief, (Doc. 15 at 13), citing Dr. Lis-Planells's March 2009 examination finding Plaintiff's deep tendon reflexes were "+2/4 bilaterally including the biceps, triceps, brachioradialis, patellar, and Achilles." (Tr. at 536.) That score, "+2/4," represents "brisk" and "normal" reflexes. *See* H. Kenneth Walker, *Deep Tendon Reflexes*, *in* Clinical Methods: The History, Physical, and Laboratory Examinations, 365, 365 (H. Kenneth Walker, et al., eds., 3d ed. 1990); *see also* Leon A. Weisberg, et al., *Essentials of Clinical Neurology* 30 (3d. ed. 1996) (noting that scores of "0 or 1+" indicate hypoactive while "3+" suggests brisk reflexes). No other record demonstrates lagging reflexes or motor weakness; her sensation, motor skills, and strength were consistently normal. (Tr. at 321, 371, 374, 492, 495, 499, 503, 533-34, 536-37, 542, 546, 624, 633, 638, 641-42, 697-98, 716, 727-29, 734, 740, 751, 767.) Plaintiff thus presents no evidence she could meet or equal these necessary portions of the listing.

Finally, Plaintiff's straight-leg raising tests do not satisfy the final listing requirement. Her lower back was involved in her impairments, triggering the last piece of the listing, which requires positive straight-leg raise tests in both the seated and supine positions. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A. Plaintiff had only two potential positive tests. The first occurred in March 2009, after her accident. (Tr. at 536.) Dr. Lis-Planells noted the result but did not explain whether Plaintiff was seated, supine, or both. The second came from Dr. Sheth's examination in February 2008, and only the supine position produced positive results, while seated straight-leg raises remained negative. (Tr. at 321.) All other tests were negative, including the more recent examinations from 2011. (Tr. at 494, 633, 638, 641, 698, 765.) The results from May 2011 tests, for example, were negative for both positions. (Tr. at 698.) The ALJ was not bound to accept the ambiguous March 2009 results–and could not accept the February 2008 report, which did not detail

46

the positions tested–as satisfying the listing. Plaintiff did not clearly test positive for both positions in either record. Given Plaintiff's failure to demonstrate definitively that she met the test, and considering the other results, she could not fulfill this requirement. Consequently, as with every other element, she failed to provide evidence that she satisfied this piece and consequently her entire listing argument fails.

Plaintiff fell far short of proving any single listing element, let alone the entire listing. This suggests that her impairments did not equal that listing either. The only other physical impairments found by the ALJ and pushed forward by Plaintiff concern her respiratory difficulties. (Tr. at 15); (Doc. 15 at 11-22). It is well beyond a layperson's ken to see how mild degenerative back disease could combine with COPD to equal medically the severity of listing 1.04A. Nor is it possible to determine how her back disorder's unique manifestations equal that listing. Tellingly, Plaintiff does not attempt this tall order in her brief. And as Plaintiff acknowledges, Dr. Hahn was the only qualified person in the record who directly opined on equivalence and he found against Plaintiff. (Tr. at 76, 87.) Thus, the evidence does not favor equivalence and Plaintiff fails to construct a plausible argument to the contrary. In these circumstances, the ALJ's analysis suffices.

### b.    Medical Source Evidence, Plaintiff's Credibility, and the RFC

#### i.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified

psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

The regulations do not prescribe any similar test for opinions from "other sources." SSR 06-03p, 2006 WL 2329939, at *3. Nonetheless, both the Sixth Circuit and the Commissioner require ALJ's to apply the factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The Ruling, perhaps unintentionally, leaves some flexibility, suggesting that the ALJ must consider these opinions but does not need to explicitly discuss them. SSR 06-3p, 2006 WL 2329939, at *6. Accordingly, some courts, relying on a close reading of the text and the Ruling, have found that they do not mandate that the ALJ expressly address "other source" opinions in the written decision. *See, e.g.*, *Boyer v. Comm'r of Soc. Sec.*, No. 1:12-cv-03088, at *17 (N.D. Ohio Dec. 13, 2013) ("SSR 06-03p does not include 'an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from "other sources."'" (quoting *Chambers v. Astrue*, 835 F. Supp. 2d 668, 678 (S.D. Ind. 2011))); *Southward v. Comm'r of Soc. Sec.*, No 11-CV-14208, 2012 WL 3887439, at *6 (E.D. Mich. May 17, 2012) ("[T]he ALJ is not required to explain the weight given [an other source] opinion nor is the ALJ required to give reasons why her opinion was discounted."), *adopted* (2012 WL 3887212 (E.D. Mich. Sept. 7, 2012); *Hickox v. Comm'r of Soc. Sec.*, No. 1:09-cv-343, 2010 WL 3385528, at *7 (W.D. Mich. Aug. 2, 2010) ("SSR 06-3p does not require that an ALJ discuss opinions supplied by 'other sources' or to explain the evidentiary weight assigned thereto."), *adopted* 2011 WL 6000829 (W.D. Mich. Nov. 30, 2011).

However, the Sixth Circuit has suggested otherwise. In *Cruse*, it the court found that SSR 06-03p requires ALJ's to examine these opinions, but declined to apply the rule retroactively. 502 F.3d at 541-42. The court has since applied the holding and required ALJs to explain their assessment of "other sources." *See Cruse*. *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th

Cir. Mar. 27, 2014) (finding that the ALJ provided an explanation meeting the requirements); *Cole v. Astrue*, 661 F.3d 931, 939-40 (6th Cir. 2011) (finding that ALJ failed to "consider" an "other source" opinion by not mentioning it in the decision). Consequently, an ALJ should discuss these opinions, or at least provide reasoning that shows the ALJ considered the substantive elements of the opinion.

Nonetheless, there is no indication that the court in *Cruse* found SSR 06-03p overturned the substantial body of case law classifying these opinions as less probative than "acceptable" sources, allowing an ALJ substantial discretion in the analysis, and absolving the ALJ from the need to discuss every piece of evidence in the record.[6] *See, e.g.*, *Kornecky*, 167 F. App'x at 508 (noting that the ALJ does not need to discuss all the evidence); *Dunmore v. Colvin*, 940 F. Supp. 2d. 677, 685 (S.D. Ohio 2013) ("[T]he regulation [20 C.F.R. § 404.1513] . . . allows the ALJ to give greater weight to 'acceptable medical sources' who are recognized as more-qualified healthcare professionals."); SSR 06-03p, 2006 WL 2329939, at * 5 ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' . . . .").

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are

---

[6] The court in *Cruse* did imply, however, that the Ruling might create tension with a portion of this case law. Before discussing the Ruling, the court cited *Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997), which held that an ALJ has discretion to weigh "other source" opinions. *Cruse*, 502 F.3d at 541. The court suggested that SSR 06-03p controlled the analysis, but nonetheless the court did not cast *Walters* into doubt and in fact cited the case repeatedly elsewhere in the opinion. *Id.* at 540, 542, 543). The holdings are congruous: *Cruse* found that SSR 06-03p simply mandated a discussion and provided the framework of that discussion, while *Walters* and similar cases allow the ALJ to operate with considerable freedom inside of that framework. Many courts adhere to both bodies of case law. *See, e.g. Hogston v. Comm'r of Soc. Sec.*, No. 12-12626, 2013 WL 5423781, at *10 (E.D. Mich. Sept. 26, 2013) (noting that an ALJ must discuss "other sources," but that the discussion "need not be extensive" and can consist of a brief assessment of the reasons behind the assessment).

"not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[7] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to

---

[7] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

51

deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y*

*of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

    (i)     [D]aily activities;

    (ii)    The location, duration, frequency, and intensity of . . . pain;

    (iii)   Precipitating and aggravating factors;

    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she]

furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at 474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

## ii.   Analysis

For many of the same reasons explained above in the listing analysis, the ALJ's opinion and credibility discussions were adequate. He did provide "good reasons" for rejecting the treating opinions. As noted, "good reasons" include the length of the relationship, the depth of treatment, whether evidence supports the opinion, the consistency with the record, and the source's specialization, if any. *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). The ALJ's decision described the course of treatment with both Dr. Lis-Planells and with Dr. Dadivas, noting the early records through the more recent. (Tr. at 16-17, 19.) He rejected Dr. Lis-Planells's opinion because, in part, the doctor himself created doubt about its contours and solidity. (Tr. at 22.) Dr.

Lis-Planells's first two statements, both concluding Plaintiff could not work, lack substance and sufficient detail. (Tr. at 464, 627, 753.) While Plaintiff is correct that a treating source's proposed RFC can bind the ALJ if it merits controlling weight, (Doc. 15 at 17); *Gentry*, 741 F.3d at 727, the deference ends when the opinion strays too far from these topics. Treating source opinions are used to assess "the nature and severity of [a claimant's] impairment(s)." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). Dr. Lis-Planell's opinions do not offer the type of concrete limitations–stemming from the impairments' "nature and severity"–that make up an RFC. Rather, most of his statements provide bare conclusions of disability *vel non*.

The first simply lists her diagnoses and states they would last her lifetime, she visited once per quarter, and that she was awaiting more epidural injections. (Tr. at 464.) Skipping other questions–including whether she could ambulate or needed medical assistance for various daily activities–Dr. Lis-Planell's concluded that she could not work, but he did not know how long this would last. (*Id.*) On thin technical grounds, this fails even to show sufficient disability. To meet the legal definition of disability, the impairments must have lasted or be expected to last at least twelve months. 20 C.F.R. §§ 404.1505(a), 416.905. The larger problem, however, is that the form does not state how the diagnoses manifest in the specific physical restrictions needed to fashion an RFC. Without any indication of these limitations, the opinion trenches upon the ultimate issue reserved to the Commissioner–whether specific limitations prevent work, in light of vocational considerations–and does not deserve "any special significance . . . ." 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

Dr. Lis-Planell's second opinion takes care of the technical quibbles but not the deeper problems. (Tr. at 627, 753.) His unaddressed letter stated that Plaintiff's disability had lasted

"[t]hroughout the past four years" and would continue in the future. (*Id.*) Again, he lists the diagnoses and Plaintiff's treatment frequency–now biannual–adding brief mention of the 2007 surgery, her continuing back pain, and Plaintiff's ongoing physical therapy and epidural injections. (*Id.*) The letter suffers the same defect as the first opinion: no specific limitations or restrictions are included. (*Id.*) Assuming it deserved deference, the ALJ nonetheless properly discredited it. (Tr. at 22.) He wrote that five months after the letter, Dr. Lis-Planells finally constructed two limitations. (*Id.*) The first restricted Plaintiff to lifting thirty pounds. (Tr. at 22, 768.) The ALJ noted that this lifting level would not, without more, preclude work. (Tr. at 22.) He also observed that when offering this limitation, Dr. Lis-Planells wrote that Plaintiff's recent x-rays showed "solid fusion" and "no instability," she "present[ed] with overall improvement" in her back and radicular pain," and the "residual back pain [was] . . . well controlled with current medication." (Tr. at 17, 22, 768.) Thus, one of the only restrictions from Dr. Lis-Planells did not suggest disability and was made among many positive observations of her condition.

Plaintiff complains that by using this as evidence, the ALJ essentially accepted everything from Dr. Planell's opinion that helped his conclusion and clumsily excised the rest. (Doc. 15 at 17.) The argument fails to persuade. The ALJ also rejected the thirty-pound limit, going even further than the doctor and limiting Plaintiff to twenty pounds for only one-third of the workday. (Tr. at 21.)

Plaintiff's more significant criticism is that the ALJ did not adopt Dr. Lis-Planell's other proposed limitation, which advised against repetitive bending. (Doc. 15 at 17); (Tr. at 768.) She again misses the mark. First, the ALJ's RFC is well supported even without the bending restriction. The evidence discussed above consistently found she had normal gait, strength, and range of

motion. (Tr. at 321, 371, 374, 492, 495, 499, 503, 533-34, 536-37, 542, 546, 624, 633, 638, 641-42, 697-98, 716, 727-29, 734, 740, 751, 767.) Any deviations were typically mild or temporary. (Tr. at 321, 494, 536, 697-98, 782.) More importantly, when Plaintiff's attorney asked the VE at the hearing how a bending restriction would affect the analysis, the VE stated, "Bending and twisting typically are not part of the jobs that I described or they don't need to be part of the jobs that I described." (Doc. 48.) She added that the DOT did not specifically address bending and twisting. (*Id.*) Elaborating, the VE explained that the jobs she selected, such as assembly and router work, did not involve "climbing, balancing, stooping, kneeling, crouching[,] and crawling . . . ." (*Id.*) She associated those actions with "bending and twisting" and concluded that a bending restriction would not change the analysis. Therefore, even if the bending restriction was included, the outcome would remain the same. To the extent the crouching and similar motions mirror bending and twisting, the RFC includes them and any distinctions in these actions do not detract from the decision.

The ALJ gave "good reasons" for discounting Dr. Dadivas's opinion. (Tr. at 22.) In contrast to Dr. Lis-Planells, Dr. Dadivas gave specific restrictions. (Tr. at 759-62.) Plaintiff contends substantial evidence supports those limitations. (Doc. 15. at 16-17.) The ALJ was justified in disagreeing. (Tr. at 22.) The objective testing and observations in appointment notes do not bear out the walking and sitting limitations. Plaintiff's gait, strength, and range of motion was almost uniformly normal.[8] Moreover, the ALJ pointed out that some of the restrictions lack any corroborating findings in the record. (Tr. at 22.) He used as an example the fingering, handling, and reaching limitation. (*Id.*) Nothing in Dr. Dadivas's notes, or any other records,

---

[8] See the listing discussion above for specific citations. *Supra*, Part II.F.2.b.

mention any difficulties with her hands. And, in fact, Plaintiff's first capacity report, which she filled out, denied any problems with reaching or using her hands. (Tr. at 216.) Her second capacity report likewise denied hand issues but now checked the box for reaching problems. (Tr. at 227.) The most recent report matches the second. (Tr. at 259.) Her arm strength was repeatedly normal. (Tr. at 503, 533-34.) The ALJ thus agreed with Plaintiff's own reports when declining to add the manipulation restrictions and he was not under any obligation to add a reaching limitation that was nowhere confirmed by objective evidence.

The ALJ also noted that Dr. Dadivas's ten-pound lifting limitation clashed with the slightly more recent assessment from Dr. Lis-Planells. (Tr. at 22, 760, 768.) The inconsistency provides grounds to discredit Dr. Dadivas. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (including consistency with the record as a factor for analyzing opinions). Plaintiff brushes this aside, protesting that the "weight [restriction] had nothing to do with the opinions of disability." (Doc. 15 at 17.) Instead, the twenty-five percent off-task time and high absenteeism rate were the critical restrictions from Dr. Dadivas. (*Id.*) These would preclude work, according to the VE. (Tr. at 45-46.)

But pressed to cite anything from the record confirming these, Plaintiff suggests only that the "clear" proof is Plaintiff's busy treatment schedule with four doctors and occasional visits to the hospital. (Doc. 19 at 3.) Frequent absences might prevent successful employment, but the case Plaintiff cites does not support that concern here. (*Id.*) In *Hartman v. Colvin*, the court faulted the ALJ for not considering whether the claimant's extensive treatment record–seventy-seven trips to the emergency room in less than two years, along with other appointments–suggested a high absenteeism rate in the future. 954 F. Supp. 2d 618, 626, 631, 645 (W.D. Ky. 2013). The VE specifically testified that if the claimant missed work at the same rate, he could not stay employed.

59

*Id.* at 631. A similar extrapolation in the present case would not come to the same result. Plaintiff sees Dr. Lis-Planells biannually, as the ALJ noted, (Tr. at 17, 768), or perhaps annually as the doctor's March 2011 letter asserted. (Tr. at 753.) The rest of the record, roughly spread over five years from 2007 through the end of 2011, is not as densely packed with the medical appointments as the record in *Hartman*. Thus, Dr. Dadivas's limitation is unexplained and the only rationale Plaintiff offers fails.

Dr. Dadivas's off-task restriction perhaps has more evidentiary support than other parts of his opinion, but still not enough to satisfy Plaintiff's claims. Part of her conclusion seems to result from her additional opinion that Plaintiff needed to elevate her leg for seventy-five percent of an eight-hour workday. (Tr. at 760-61.) Yet, her opinion is the first place in the record that any doctor mentioned elevation; Plaintiff also testified she keeps her legs raised. (Tr. at 40.) Again, however, Plaintiff's gait, strength, and range of motion consistently tested as normal.[9] Moreover, the VE testified that slight leg elevation would not affect her employability. (Tr. at 46.)

To the extent Dr. Dadivas's concentration assessment relied on Plaintiff's mental health struggles, it also remains largely unsupported. (Tr. at 759.) She wrote the opinion in June 2011. (Tr. at 759-62.) Prior to that, she drafted a shorter opinion in May 2010 stating Plaintiff showed no unusual anxiety or depression. (Tr. at 739-40.) Almost all of Dr. Dadivas's session notes before the June 2011 opinion likewise state Plaintiff was not anxious, depressed, or suicidal. (Tr. at 702, 712, 716-17, 725, 733.) In Plaintiff's last session, after Dr. Dadivas wrote the opinion, the notes again state she was "[n]egative for psychiatric symptoms" and, specifically, she was not anxious or suicidal. (Tr. at 772-73.) Nevertheless, Dr. Dadivas apparently perceived depression, assessing

---

[9] See the listing discussion above for specific citations. *Supra*, Part II.F.2.b.

it for the first time and starting Plaintiff on medication. (Tr. at 773-74.) Thus, again, the evidentiary basis for Dr. Dadivas's opinion is not apparent from her treatment record with Plaintiff, nor from other reports in which Plaintiff denied significant mental health issues or problems concentrating. (Tr. at 216-17, 765.) The ALJ handled this opinion appropriately.

Plaintiff also criticizes the ALJ for failing to explicitly consider her mother's affidavit. (Doc. 19 at 21-22.) Because she was an "other source," the ALJ was required to show he considered the opinion. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The ALJ did not explicitly address the affidavit, though he did mention the mother in an unrelated context. (Tr. at 15.) Arguably, the absence of an express finding regarding the affidavit fails to follow SSR 06-3p. *See Hill*, 560 F. App'x at 550; *Cole*, 661 F.3d at 939-40; *Cruse*, 502 F.3d at 540-42. However, the ALJ did explicitly address every contention Plaintiff's mother made because they were also each made by Plaintiff. Thus, whether this suffices under SSR 06-3p to show consideration or not, the opinion provides nothing new and any oversight is harmless. That is, remanding so that the ALJ can consider a few statements identical to ones he already considered would almost certainly not change the outcome. *See Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (6th Cir. 1993) (noting that harmless error applied where the mistake did not affect the procedure or substance of the decision, and where the court was not "'in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture . . . .'" *Id.* at *7 (quoting *Kurzon v. United States Postal Serv.*, 539 F.2d 788, 796 (1st Cir. 1976))).

Plaintiff's mother's affidavit merely repeated a few of Plaintiff's allegations. She said Plaintiff could not lift any weights over five pounds, stand in place or sit for more than five

minutes; used an electric cart to shop, often lost her breath; struggled to fall asleep; and took pain medications. (Tr. at 279-80.) Plaintiff made the same allegations, many of them at the hearing; the only possible difference was that neither Plaintiff nor Dr. Dadivas estimated a five minutes cap for sitting and standing. (Tr. at 34, 41-42, 211, 213, 224, 230-31, 256-57, 754-55, 760.) The ALJ referred to her breathing problems, the pain medication, various lifting restrictions, and her daily activities. (Tr. at 15-20.) The affidavit, then, adds nothing new and should not require remand.

Finally, and for many of the same reasons described above, the credibility analysis was sufficient. Plaintiff's attack on the boilerplate language is misdirected. (Doc. 15 at 19-20.) The template states that Plaintiff's impairments could cause the alleged symptoms, but that Plaintiff is not credible about their severity, persistence, and limitations "to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. at 21.) The language is inartful at best, and a complete mangling of the required analysis at worst. *See Bjornson v. Astrue*, 671 F.3d 640, 644-46 (7th Cir. 2012) (describing, as Judge Richard Posner put it, how the court "stubbed our toe on a piece of opaque boilerplate" that misconceives the regulations).

Had the ALJ's analysis here proceeded along that twisted path, I would be tempted to recommend granting Plaintiff's motion. But it did not. Instead, the ALJ discussed evidence touching on each credibility factor in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). He described Plaintiff's daily activities, her descriptions of the pain, the factors that triggered and increased her pain, and her treatment methods. (Tr. at 15-19.) He repeatedly pointed out that Plaintiff continued to smoke, despite strong advice to quit, and at one point even denied any intention to stop. (Tr. at 15-19, 22.) Acknowledging that she denied the surgery and the medications helped, he noted that nonetheless Dr. Lis-Planell's recent notes suggested improvement and greater effectiveness of the

medications. (Tr. at 21-22, 769.) A few post-surgery records he cited also suggested improvements, though he admitted that Plaintiff later complained of worsening pain. (Tr. at 16-17.) Indeed, records after the surgery indicated subjective and objective improvement. (Tr. at 373, 375, 491, 494, 496, 539, 545.) Her respiratory problems were not consistent and many notes state her breathing was clear. (Tr. at 291, 432, 605, 630, 724, 734.)

He also added a thorough description of the objective evidence, showing that it did not support Plaintiff's claims. (Tr. at 21-22.) This discussion did not, as Plaintiff implies, (Doc. 15 at 19), violate SSR 96-7p, 1996 WL 374186, at *1, by hinging the entire credibility analysis on the lack of substantiating objective evidence. Instead, it simply bolstered his analysis. Together, he assembled substantial evidence to support his conclusions.

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right

of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 30, 2015              /S PATRICIA T. MORRIS
                                     Patricia T. Morris
                                     United States Magistrate Judge